William D. Hyslop
United States Attorney
Eastern District of Washington
George J.C. Jacobs III
Assistant United States Attorney
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| UNITED STATES OF AMERICA, | |
|---|---|
| Plaintiff, | 4:19-CR-6068-SMJ |
| v. | |
| JONATHON F. SCHUMANN, | United States' Sentencing Memorandum |
| Defendant. | |

Plaintiff, United States of America, by and through William D. Hyslop, United States Attorney for the Eastern District of Washington, and George J.C. Jacobs III, Assistant United States Attorney for the Eastern District of Washington, submits the following Sentencing Memorandum.

On December 3, 2019, a federal grand jury returned a sixteen-count Indictment charging Defendant with aiding and assisting in the preparation and filing of false income tax returns, in violation of 26 U.S.C. § 7206(2). ECF No. 1. On November 5, 2020, Defendant pleaded guilty pursuant to Fed.R.Crim.P. 11(c)(1)(C) to Counts 2, 10 and 16. ECF No. 27. The parties did not agree on a tax loss. Defendant "believes the overall tax loss is $45,592 (the loss arising from the counts charged in the Indictment) and reserves the right to contest the United States' calculation of a $149,610 tax loss at sentencing." ECF No. 27. The parties further agreed that Defendant "owes restitution in an amount not less than $25,000 but not greater than

United States' Sentencing Memorandum - 1

$149,610 to the IRS." ECF No. 27. The parties agreed that a sentence of 12-months home confinement or 18-months imprisonment was an appropriate disposition in the case. *Id.*

I. **Background and Offense Conduct**

During the relevant period, Defendant was a self-employed tax return preparer operating as "J's Income Tax." The IRS investigation revealed Defendant prepared tax returns on behalf of clients from approximately 2013 to 2016.[1] IRS-CI interviewed approximately 30 of Defendant's clients who confirmed the false numbers on their 2015 and 2016 returns and that the falsities were not based on information they provided Defendant. Defendant communicated with his clients remotely via email and text, and he generally did not review completed returns with clients before filing.

Regarding Counts 1 through 15, IRS-CI obtained a tax return prepared and electronically submitted by Defendant, reviewed that return with the taxpayer, and confirmed the false items with each taxpayer. Based on the taxpayers' descriptions of the false items, a revenue agent calculated the tax loss for each return. The false deductions in the tax returns fall under two categories, "Sch. A," which includes false charitable deductions and personal property taxes, and "Form 2106," which includes all Unreimbursed Employee Business Expenses (UEBE). The returns were

---

[1] The IRS investigation revealed Defendant prepared approximately 843 individual income tax returns. Sixty-eight percent of those returns were for taxpayers in Nevada; thirty-two percent were for taxpayers in various other states, including Washington. Ninety-four percent of the returns Defendant prepared claimed an average tax refund of $3,893. According to IRS databases, over 6.3 million individual income tax returns were filed for taxpayers in Nevada for 2012-16, of which seventy-eight percent claimed a refund. The average refund claimed was $2,899.

United States' Sentencing Memorandum - 2

electronically filed by Defendant from the Eastern District of Washington. According to the IRS, the tax loss arising from the conduct charged in Counts 1 through 15 is $45,592. *See* Sealed Sentencing Exhibit 1.

A. Client Interviews

IRS-CI interviewed the taxpayers, some of whom were married couples filing jointly. Each of these taxpayers confirmed that Defendant falsified items on their returns and included information not provided by the taxpayer.

As an example, D.W. told IRS-CI the following:

> [D.W.] lives in Las Vegas, Nevada. [D.W.] engaged Defendant to prepare his 2015 tax return after a stranger gave [D.W.] Defendant's business card. Defendant prepared [D.W.]'s 2015 and 2016 tax returns. [D.W.] and Defendant communicated through texts and emails, and [D.W.] never met Defendant in person. [D.W.] emailed Defendant his Forms W-2 and 1099-R. Defendant charged [D.W.] around $350 per return. Defendant did not review returns with [D.W.] before filing them.

IRS-CI showed [D.W.] his 2015 and 2016 Forms 1040. [D.W.] confirmed his identifying information on both returns, and that Defendant prepared them. [D.W.] confirmed that the business expenses, charitable donations, and personal property taxes deducted on the returns were false. [D.W.] did not provide information supporting the false deductions, which included false donations, taxes, vehicle expenses, mileage, meals and entertainment expenses, union dues, subscriptions, tools, uniforms, cellphone, internet, parking fees, and tolls.

The clients interviewed by IRS confirmed similar facts regarding the false items on the returns, and that Defendant included items on the returns that the taxpayer did not know about. The revenue agent used their interview statements in calculating the tax loss.

///

///

///

B. Underscore: Undercover Operation

As part of the investigation, IRS-CI conducted an undercover operation in which an undercover agent posed as a client. The undercover met with Defendant at Defendant's house, providing him information that should have resulted in a tax return with a tax due of $578. Defendant lied about being an enrolled agent[2] then prepared a false tax return claiming false employee business expenses, sales and personal property taxes, charitable contributions, and tax preparation fees, resulting in a refund of $3,058. Defendant's false items resulted in a $3,636 difference in tax owed.

C. Search Warrants

IRS-CI executed search warrants on Defendant's home in Richland, Washington, his cell phone, and his email account. According to the Special Agent's Report, records seized included communications between Defendant and clients, tax documents Defendant's clients gave him, and copies of returns Defendant prepared. The agent reviewed the communications involving the counts charged in the Indictment and found them consistent with the clients' interviews.

D. Defendant Interview

IRS-CI interviewed Defendant on June 22, 2017, while executing a search warrant. Defendant stated the following:

> Defendant lives in Richland, Washington, but spends part of the year in Las Vegas. He conducts his tax business from both locations, using the email address Jonschu88@yahoo.com to communicate with clients. Defendant has a bachelor's degree in business administration from Southern California International College.
>
> Defendant has prepared tax returns since 2000. He participates in the IRS's Annual Filing Season Program, but he is not an enrolled agent. He completed a 60-hour course upon entry into this program and annually updates his skills training. He runs his tax preparation business online through emails or texts. He started preparing tax returns when he lived in Las Vegas and continued working

---

[2] https://www.irs.gov/tax-professionals/enrolled-agents/enrolled-agent-information

United States' Sentencing Memorandum - 4

with clients after moving to Richland in 2013. He likes to meet clients in person the first time.

Defendant said he goes over the returns in detail with clients over the phone or video chat. He does not go over the returns line-by-line. Clients provided him Forms W-2, 1099, 1098, and other applicable documents. Clients generally emailed him a list of deductions. IRS-CI showed Defendant some client returns and asked him about business expenses deducted. He claimed that clients texted him the amounts he included on the returns.

IRS-CI showed Defendant a return with a $500 deduction for a tax preparation fee. Defendant admitted that this amount was too high. He then stated that in some cases, clients gave him outrageous amounts to deduct, and Defendant reduced these amounts to a reasonable number. He insisted that he based everything on the returns on what the clients told him.

E. Relevant Conduct

The government believes the relevant conduct tax loss for tax years 2015 and 2016, is $149,610. *See* sealed Sentencing Exhibit 2 attached hereto. This tax loss will be explained in greater detail below. Therefore, the total tax loss, including relevant conduct, for tax years 2015 and 2016 is $195,202 ($45,592 + $149,610).[3]

---

[3] After entry of the Plea Agreement, the United States discovered it made a computational error in the tax loss. The error does not affect Defendant's offense level. The $149,610 tax loss set forth in the Plea Agreement inadvertently omitted the tax loss ($45,592) for Counts 1 – 15. The United States notified Defendant's counsel and Officer Carter that it believes the correct tax loss, including relevant conduct, is $195,202 and not $149,610. The United States has sent to defense counsel an Addendum to the Plea Agreement regarding the $195,202 tax loss amount. If the parties sign the Addendum, the United States will be recommending a tax loss of $195,202. Defendant still reserves his right to contest the higher amount. **If the**

United States' Sentencing Memorandum - 5

### A. The Government's Tax Loss Calculations Are Accurate, Conservative, and Should be Adopted by the Court

When the parties contest the amount of tax loss, the sentencing court must hold an evidentiary hearing to resolve factual issues. *United States v. Lindsey*, 482 F.3d. 1285, 1294 (11th Cir. 2007). See USSG § 1B1.3(a)(1)(A). The tax loss, including relevant conduct, is $149,610. *See* sealed Sentencing Exhibits 1 and 2.

The government's tax loss number is conservative. From 2013 to 2016, Defendant filed at least 671 tax returns. Of these, 633 claimed refunds, and over 400 of those claimed unreimbursed employee expenses. The IRS does not have the resources to audit all those tax returns. As a compromise, it audited approximately 60 returns prepared by Defendant. Thus, the Government's method is as follows: 1) the tax loss ($45,592) resulting from the 15 income tax returns prepared by Defendant charged in Counts 1 through 15 of the Indictment; 2) the addition of approximately 52 returns prepared by Schuman that were audited by IRS (approximate tax loss of $149,610) and determined to contain false items similar to the false items alleged in Counts 1 through 16. The two categories total $195,202.[4]

### I. Fed.R.Crim.P 11(c)(1)(C) Plea Agreement and Guidelines Calculations

On November 5, 2020, Defendant pled guilty pursuant to Fed. R. Crim. P. 11(c)(1)(C) to Counts 2, 10 and 16 of the Indictment. ECF No. 27. Defendant

---

**parties do not sign the Addendum, the United States is bound by the $149,610 tax loss set forth in the Fed.R.Crim.P. 11(c)(1)(C) Plea Agreement and will be recommending that figure at sentencing**. (Emphasis added).

[4] This calculation is conservative and gives the benefit of the doubt to the Defendant. The Government chose not to use utilize the extrapolation method that may have resulted in a much larger tax loss number. *See United States v. Mehta*, 594 F.3d 277 (4th Cir. 2010).

United States' Sentencing Memorandum - 6

acknowledged that the United States will recommend that his Base Offense Level is 16. *See* USSG §§2T1.1(a)(1), 2T4.1(F). Defendant will recommend that his Base Offense Level is 14. *See* USSG §§2T1.1(a)(1), 2T4.1(E). The parties agreed that a 2-level increase is applicable because Defendant prepared tax returns as a business. USSG §2T1.4(b)(1)(B). The parties also agreed that Defendant's timely guilty plea warranted a three-level reduction for acceptance of responsibility, bringing Defendant's total offense level to 13 or 15.

Fed. R. Crim. P. 11(c)(1)(C) permits the parties to "agree that … a sentencing range is the appropriate disposition of the case." The agreement becomes binding on the Court only upon the Court's acceptance of the plea agreement. Although the Sentencing Guidelines remain a starting point for a district court in assessing the reasonableness of an agreement under Fed. R. Crim. P. 11(c)(1)(C), the Sentencing Guidelines remain advisory, and the parties are not limited to them in reaching their agreement that a specific sentence is the appropriate disposition of the case. *See United States v. Pacheco-Navarette*, 432 F.3d 967 (9th Cir. 2005), where this Circuit held that it is a "false premise that stipulated sentences must comport with the Guidelines … We accept the proposition explicitly: as the Guidelines are advisory only … there can be no reasonable argument that the court does not have the authority to accept a stipulated sentence that does not comport with them." 432 F.3d at 970. *See also United States v. Cieslowski*, 410 F.3d 353, 364 (7th Cir. 2005) ("A sentence imposed under a Rule 11(c)(1)(C) plea arises directly from the plea agreement itself, not from the guidelines …. As *Booker* is concerned with sentences arising under the Guidelines, it is inapplicable in this situation."). Justice Sotomayer based her concurring opinion in *Freeman v. United States*, 131 S.Ct. 2685 (2011) on a similar analysis, stating that in sentencing a defendant following the acceptance of a plea agreement pursuant to Fed. R. Crim. P. 11(c)(1)(C),

> [t]he term of imprisonment imposed by the sentencing judge is dictated by the terms of the agreement entered into by the parties, not

United States' Sentencing Memorandum - 7

> the judge's Guidelines calculation. In short, the term of imprisonment imposed pursuant to a (C) agreement is, for purposes of § 3582(c)(2), 'based on' the agreement itself. To hold otherwise would contravene the very purpose of (C) agreements – to bind the district court and low the Government and the defendant to determine what sentence he will receive.

*Id.* at 2696. Despite the fact that the parties may agree to a sentence outside of the advisory Guideline range, it is anticipated that this Court will consider the Guidelines in determining whether to accept the plea agreement. USSG § 6B1.2(c).

In the present case, the parties have agreed that a sentence range of 12-months home confinement to 18-months incarceration is the appropriate disposition of the case. Under the circumstances of this case, the United States believes that the sentencing range proposed in the plea agreement is a reasonable resolution intended to bring certainty and finality to the proceedings. The proposed period of incarceration or home confinement is substantial. Defendant has no criminal history. The proposed sentence appears adequate to deter the Defendant and others similarly situated. It recognizes the seriousness of Defendant's conduct. In light of the compromise represented by Defendant's acceptance of responsibility in this case, the United States believes that the sentencing range is consistent with the goals of 18 U.S.C. § 3553 and asks the Court to accept the terms of the plea agreement entered in this case.

## II.  **18 U.S.C. § 3553(a) Factors**

In addition to determining the Guidelines range, the Court must also weigh the sentencing factors set forth in 18 U.S.C. § 3553(a) to determine the defendant's sentence. Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to

United States' Sentencing Memorandum - 8

provide the defendant with educational and vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar crimes; and (7) the need to provide restitution to any victim of the offense. 18 U.S.C. §3553(a). A prison sentence of 18 months is sufficient, but not greater than necessary, to account for the need for deterrence and the nature and seriousness of Defendant's offense, which involved over 60 false tax returns and which resulted in a loss to the United States Treasury.

### A. Need for General Deterrence

In the context of a prosecution for tax fraud, it is particularly important that the sentence imposed promote general deterrence. Our nation's system of tax laws relies on the voluntary compliance of individual taxpayers to accurately report their income. And in fact, the majority of taxpayers do fulfill their legal obligations as citizens by honestly reporting and paying their taxes. However, IRS studies reveal that a persistent subset of the population—approximately 16.4 percent, based on the latest estimate—do not.[5] The result is a yearly tax gap of more than $441 billion in unreported and uncollected taxes.[6] Of that amount, approximately $314 billion is the

---

[5] *Tax Gap Estimates for Tax Years 2011–2013*, Publication 1415 (Rev. 9-2019), *available at* https://www.irs.gov/pub/irs-pdf/p1415.pdf.

[6] *Id.*

United States' Sentencing Memorandum - 9

result of individuals' noncompliance.[7] Because of this noncompliance, law-abiding taxpayers incur the effective equivalent of a $3,000 "surtax" to subsidize tax cheats.[8]

Tax return preparers like Defendant play an important role in closing this tax gap and insuring that taxpayers accurately report their income. According to the IRS, paid preparers completed more than half of the approximately 150 million individual income tax returns filed in fiscal year 2017.[9] As these numbers demonstrate, the sort of tax fraud perpetrated by Defendant has the potential to cause widespread harm to the nation's system of tax administration.

Nevertheless, criminal prosecutions to curtail noncompliance and outright tax fraud are relatively scarce, reflecting the limited availability of resources necessary to conduct and prosecute such cases. According to recent figures from the United States Sentencing Commission, there were only 517 prosecutions for tax fraud in fiscal year 2018, which represents a mere 0.7 percent of all defendants sentenced in federal prosecutions.[10]

---

[7] Another $42 billion results from corporate income tax noncompliance, $81 billion from employment tax noncompliance, and $3 billion from estate and excise tax noncompliance. *Id.*

[8] *See National Taxpayer Advocate 2020 Purple Book: Compilation of Legislative Recommendations to Strengthen Taxpayer Rights and Improve Tax Administration*, Publication 5286 (Rev. 12-2019), *available at* https://taxpayeradvocate.irs.gov/Media/Default/Documents/2019-ARC/ARC19_PurpleBook.pdf.

[9] *2018 Tax Statistics*, Publication 4198 (Rev. 9-2018), *available at* https://www.irs.gov/pub/irs-soi/18taxstatscard.pdf.

[10] *See* "Quick Facts: Tax Fraud Offenses" (August 2019), *available at* https://www.ussc.gov/research/quick-facts/tax-fraud.

United States' Sentencing Memorandum - 10

"Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations," the United States Sentencing Commission has stressed in its introductory comments that "deterring others from violating the tax laws is a primary consideration underlying the Sentencing Guidelines." USSG, Ch. 2, Pt. T, intro. comment. Of course, as the Sentencing Commission has recognized, the sentence imposed must provide sufficient punishment in order to deter potential tax offenders. *Id.* ("Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators."). A term of imprisonment is often necessary in order to achieve such a deterrent effect, given the limited number of tax prosecutions relative to their incidence.[11] This principle is something that the Fourth Circuit recognized and endorsed in vacating a probationary sentence imposed in a tax evasion case:

> Given the nature and number of tax evasion offenses as compared to the relatively infrequent prosecution of those offenses, we believe that the Commission's focus on incarceration as a means of third-party deterrence is wise. The vast majority of such crimes go unpunished, if not undetected. Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path.

*United States v. Engle*, 592 F.3d 495, 501 (4th Cir. 2010). And indeed, "[s]tudies have shown that salient examples of tax-enforcement actions against specific taxpayers, especially those that involve criminal sanctions, have a significant and positive deterrent effect."[12]

---

[11] *See generally*, Louis Kaplow and Steven Shavell, *Fairness Versus Welfare*, 114 Harv. L. Rev. 961, 1225-1303 (2001).

[12] Joshua D. Blank, *In Defense of Individual Tax Privacy*, 61 Emory L.J. 265, 321 (2011).

United States' Sentencing Memorandum - 11

For this reason, sentencing Defendant to 18 months in prison is likely to have a salutary effect. The next return preparer who is tempted by the quick profit to be made filing fraudulent tax returns will have to consider the possibility that his conduct could result in a significant term in prison.

### B. Nature and Seriousness of the Offense

Defendant committed a serious theft from the United States. While his plan was simple, it was also highly effective. He successfully stole $149,610 (and possibly as much as $195,202) from the government by preparing approximately 60 materially false income tax returns, enriching his clients through the fraudulent refunds they received and himself for the fees he charged. Defendant knew that what he was doing was wrong. The seriousness of Defendant's particular offense likewise merits a sentence of 18-months. Defendant benefited from his offense, even as he defrauded the United States Treasury out of tax revenue. By getting his customers larger tax refunds than they could obtain from a legitimate return preparer, Defendant presumably was able to entice additional clients to his business (and conversely make it harder for ethical return preparers to compete).

## III. Restitution

The United States recommends restitution of $149,610, as set forth in the Fed.R.Crim.P. 11(c)(1)(C) Plea Agreement. ECF No. 27. However, if the parties enter into an Addendum to the Plea Agreement at or before sentencing, the United States will be recommending that Defendant pay restitution "in an amount not less than $25,000.00 but not greater than $195,202 to the IRS." At the sentencing hearing, the government anticipates providing the Court with a schedule that allocates the

restitution amount to individual taxpayers and returns.[13]  The government respectfully requests that the Court incorporate this schedule into its judgment to permit the IRS to allocate the restitution payments appropriately.

## IV.    Conclusion

Defendant prepared and submitted over 60 income tax returns to the IRS that he knew to be materially false.  An 18-month term of imprisonment, along with an order of restitution, is the only sentence that adequately takes into account the seriousness of Defendant's conduct, the need to promote respect for the law, and the need to deter other tax return preparers who are considering going down the same path.  The United States requests that the Court order Defendant to pay restitution to the United States Treasury.

Dated:  February 18, 2021.

William D. Hyslop
United States Attorney

*s/ George J.C. Jacobs III*
George J.C. Jacobs III
Assistant United States Attorney

---

[13] The IRS is determining whether additional payments have been made toward any of the liabilities at issue. If any payments have been made, the government will advise the Court at sentencing of the revised restitution amount sought.

United States' Sentencing Memorandum - 13

**CERTIFICATE OF SERVICE**

I hereby certify that on February 18, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Gary Metro

<u>s/ George J.C. Jacobs III</u>
George J.C. Jacobs III
Assistant United States Attorney